Filed 7/31/24  P. v. Bettancourt CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B327291 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. VA055029) |
| v. | |
| RUDY BETTANCOURT, | |
| Defendant and Appellant. | |

Appeal from an order of the Superior Court of Los Angeles County, Raul Anthony Sahagun, Judge.  Affirmed.

Joanna McKim, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Stephanie C. Brenan and Gabriel Bradley, Deputy Attorneys General, for Plaintiff and Respondent.

_____

In 2001, a jury convicted Rudy Bettancourt (Bettancourt) of the robbery and first degree felony murder of Gayle Ulsh (Ulsh), whom Bettancourt attacked outside a bar. The trial court sentenced Bettancourt to life in prison without the possibility of parole.

Almost 20 years later, the Legislature " 'amend[ed] the felony murder rule . . . to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.' [Citation.]" (*People v. Arellano* (July 11, 2024, S277962) __ Cal.5th __ [2024 WL 3366457 at *8].) The Legislature also enacted Penal Code[1] section 1172.6 (formerly § 1170.95), which, as relevant here, permits a person convicted under a now-invalid theory of felony murder to file a petition challenging the conviction. (§ 1172.6, subd. (a).)

Bettancourt filed a section 1172.6 petition seeking to invalidate his conviction for felony murder. The trial court summarily denied the petition, concluding that—as the actual killer—Bettancourt is ineligible for relief as a matter of law. Bettancourt now asks us to reverse the order denying his petition, arguing that the court (1) improperly relied on the factual summary from our opinion in his direct appeal, (2) ignored that a factual dispute remains concerning whether his attack killed Ulsh—and thus whether he is the "actual killer," and (3) violated his state and federal due process rights.

We conclude, however, that Bettancourt is categorically ineligible for section 1172.6 relief because the record establishes conclusively that the jury convicted him as Ulsh's actual killer.

---

[1] All subsequent statutory references are to the Penal Code.

Any error by the court in relying on our prior opinion therefore was harmless, and we necessarily also reject Bettancourt's claim that denial of the petition violated his due process rights. We therefore affirm.

## FACTUAL SUMMARY AND PROCEDURAL HISTORY[2]

### A. *Brief Overview of the Crimes*

For context, we provide the following brief account of the circumstances of the offenses from this court's opinion in Bettancourt's direct appeal of his convictions. (*People v. Betancourt*[3] (Mar. 28, 2002, B149980) [nonpub. opn.] (*Bettancourt I*).) Our resolution of the present appeal is not dependent upon this factual account, but upon the theories presented, jury instructions given, and verdicts returned at trial, which we summarize below.

"The victim, Ulsh, in his 60s, spent the evening in a bar buying drinks for several women and flirting with the woman who was 'leading the [k]araoke.' Ulsh was quite drunk and soon became obnoxious and profane. During the course of the evening he repeatedly flashed 'a really thick stack of, like, $20 bills.' At one point, Ulsh started cursing the bartender because she would not deliver drinks to the tables. The bartender ordered Ulsh to leave the bar. Ulsh became irate. [Bettancourt] managed to get Ulsh to calm down somewhat and escorted Ulsh out of the bar.

---

[2] We summarize here only the facts and procedural history relevant to our resolution of this appeal.

[3] Appellant's name is spelled with only one "t" (i.e., Betancourt) in some of the materials from his prior appeal. In this appeal, he has spelled his name "Bettancourt." We note that the information filed in this case, discussed *post*, charged appellant under both names.

"Once outside, [Bettancourt] inflicted fatal head injuries on Ulsh and left him lying on his back, spread-eagled in the street in a traffic lane. [Bettancourt] relieved Ulsh of his money.

"The deputy medical examiner concluded Ulsh had been beaten and had suffered several severe head injuries, including a fractured skull. Some of the injuries could have been sustained when Ulsh fell to the pavement." (*Bettancourt I*, *supra*, B149980, fn. omitted.)

### B.    *Bettancourt's Trial*

In June 2000, the Los Angeles County District Attorney's Office charged Bettancourt with murder (§ 187, subd. (a), count 1) and robbery (§ 211, count 2). The information alleged further the "special circumstance" that Bettancourt had committed the murder while engaged in the crime of robbery. (§ 190.2, subd. (a)(17).)

At trial, the prosecutor relied exclusively on a felony murder theory of guilt. He conceded that Bettancourt lacked the intent to kill Ulsh, but argued that the jury nonetheless should convict Bettancourt of first degree murder because he had killed Ulsh during the course of a robbery:

"[The prosecutor]:  . . . [Bettancourt] killed a man by the name of Gayle Ulsh.

"[¶] . . . [¶]

"And not only did [Bettancourt] kill him, but he robbed him as well.

"He killed . . . Ulsh by beating him up. He hit him so hard, he knocked him out. Knocked him so that his head actually hit the pavement on Lakewood Boulevard so hard that . . . Ulsh died from being struck with blunt force trauma to the head.

"[Ulsh] was left there to die until he was found by some of the witnesses in this case . . . .

4

"[¶] . . . [¶]

" . . . I am going to ask you to find [Bettancourt] as he sits here today guilty of what's called felony murder, felony murder.

"Many of you may have heard of it.  It is a form of a first-degree murder wherein the law says that, if you kill somebody, even if you don't intend to kill them, even if you don't intend to, if you do something that results in the death of a human being while you are committing another felony, in this case[,] robbery, and that person dies, the law holds you responsible for something called felony murder, and that is exactly what I am going to ask you to find [Bettancourt] guilty of after we're done. . . .

"[¶] . . . [¶]

" . . . I do, do ask you unquestionably, because I think the evidence shows it to be unquestionable, to find [Bettancourt] guilty of first-degree felony murder, because when he went outside that bar he did it for the purpose of robbing . . . Ulsh.  He robbed him.

"He didn't intend to kill . . . Ulsh, I submit to you that, but he killed him, and the law says you kill someone in the commission of a robbery, you are guilty of first-degree murder on a felony murder theory."

Bettancourt did not dispute that he attacked Ulsh, or that the injuries he inflicted killed Ulsh.  Instead, Bettancourt argued that the jury could not convict him of felony murder because he had unintentionally killed Ulsh during a "bar fight," and he had not formed the intent to rob Ulsh until the fight concluded:

"[Defense counsel]:  . . . [T]here's no question about force being applied here, a taking.  The question is, what was going on inside the mind of [Bettancourt], and when was it going on, whatever it was?

"[¶] . . . [¶]

5

" . . . [W]e're talking about a bar fight here, ladies and gentlemen. . . .

"[¶] . . . [¶]

" . . . [C]learly there was a fight. It was a fight in my opinion. The circumstantial evidence shows more of a fight than a mugging.

"[¶] . . . [¶]

"[Bettancourt] is not asking to be excused for his conduct here. In many ways, his conduct was quite reprehensible, and from you, ladies and gentlemen, he is not asking for forgiveness. . . .

"[¶] . . . [¶]

"I understand this is a very subtle point, but this whole law of felony murder has revolved around, has evolved from a feeling that we must punish people who have evil intent. To prove a defendant is guilty of the crime of robbery, there must be a showing of intent to steal before or during the application of force, rather than merely after the application of force.

"Ladies and gentlemen, call [Bettancourt] a criminal. Call him a criminal. But don't call him a murderer. Call him what he is, all right? And that's at most a manslaughterer and a thief."

With respect to the murder charge, the trial court instructed the jury only on the findings required for felony murder and the felony-murder special circumstance alleged pursuant to section 190.2, subdivision (a)(17). The court did not instruct on any alternative theories of murder, aiding and abetting, the natural and probable consequences doctrine, or any other theory of imputed malice.

The jury convicted Bettancourt of first degree felony murder and robbery. It also found true the felony-murder special circumstance. The court sentenced Bettancourt to prison for life without the possibility of parole. We affirmed Bettancourt's convictions on appeal. (*Bettancourt I, supra,* B149980.)

6

### C. *Subsequent Changes to the Law of Felony Murder*

Effective January 1, 2019, approximately 18 years after Bettancourt's conviction, "the Legislature passed Senate Bill [No.] 1437 [(2017–2018 Reg. Sess.)] 'to amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.' [Citation.]" (*People v. Lewis* (2021) 11 Cal.5th 952, 959 (*Lewis*).)

"To modify the felony-murder rule, Senate Bill No. 1437 added section 189, subdivision (e) [citation], which states: '(e) A participant in the perpetration or attempted perpetration of a felony listed in subdivision (a) in which a death occurs is liable for murder only if one of the following is proven: [¶] (1) The person was the actual killer. [¶] (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree. [¶] (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life.' " (*People v. Lopez* (2022) 78 Cal.App.5th 1, 11–12 (*Lopez*).)

The bill also added section 1172.6, which provides a procedure whereby "convicted murderers who could not be convicted under the law as amended" may petition to have their conviction vacated and be resentenced on any remaining counts. (*Lewis*, *supra*, 11 Cal.5th at p. 959.) Effective January 1, 2022, the Legislature enacted Senate Bill No. 775 (2021–2022 Reg. Sess.), which, inter alia, expanded the scope of section 1172.6's relief to defendants convicted of murder based on any "other theory under which malice is imputed to a person based solely on that person's

7

participation in a crime." (§ 1172.6, subd. (a)(1); *People v. Coley* (2022) 77 Cal.App.5th 539, 548.)

"If [a petitioner] makes a prima facie showing for relief, the court must issue an order to show cause and hold an evidentiary hearing" at which the prosecution must prove beyond a reasonable doubt that the petitioner is guilty of murder under California law as amended by Senate Bill No. 1437.  (*People v. Estrada* (2024) 101 Cal.App.5th 328, 336; § 1172.6, subd. (d)(3).)  In assessing eligibility at the prima facie stage, the court " ' "takes petitioner's factual allegations as true and makes a preliminary assessment regarding whether the petitioner would be entitled to relief if his or her factual allegations were proved." ' " (*Lewis*, *supra*, 11 Cal.5th at p. 971.)  " '[A] court should not reject the petitioner's factual allegations on credibility grounds without first conducting an evidentiary hearing.' [Citations.]" (*Ibid.*)  The court may summarily deny the petition, however, if the record of conviction demonstrates that the petitioner is ineligible for relief as a matter of law.  (*Id.* at pp. 970–972.)

Where a trial court denies a section 1172.6 petition based on the failure to make a prima facie case for relief, our review is de novo.  (See *Coley*, *supra*, 77 Cal.App.5th at p. 545.)

### D.    *Bettancourt's Section 1172.6 Petition*

In April 2022, Bettancourt filed a section 1172.6 petition challenging his conviction for felony murder.  The trial court concluded that Bettancourt had failed to establish a prima facie case for relief, reasoning:

"[Bettancourt]'s the only defendant, the only actor.  It's a clear felony murder, clear felony murder, and the statute is explicit that says that the petitioner is not entitled to relief under certain circumstances and the first one is if he is the actual killer.

8

[¶] . . . [¶] . . . [T]he court finds that the petitioner has not made a prima facie case and will deny the petition."

Bettancourt timely appealed.

## DISCUSSION

Bettancourt is ineligible for section 1172.6 relief as a matter of law because the record of conviction establishes the jury convicted him of felony murder as Ulsh's actual killer.

At trial, the prosecution presented only a felony murder theory of guilt, arguing that Bettancourt personally attacked Ulsh in order to rob him. Bettancourt did not dispute that he attacked and injured Ulsh, nor did he argue that any other perpetrator was involved in the incident. The court did not instruct on accomplice liability or, indeed, any theory of murder other than felony murder. The jury convicted Bettancourt of both first degree felony murder and robbery. Finally, the jury found true the section 190.2, subdivision (a)(17) felony-murder special circumstance—a finding the instructions permitted the jury to make only if it determined that Bettancourt "actually killed"[4] Ulsh "in the commission . . . of robbery . . . [¶] . . . in

---

[4] The paragraph of the special circumstances instruction in which the "actually killed" language appears provides in full: "Unless an intent to kill is an element of a special circumstance, [if] you are satisfied beyond a reasonable doubt that the defendant actually killed a human being, you need not find that the defendant intended to kill in order to find the special circumstance to be true." "By negative inference," this language instructs that "a defendant who was not the actual killer could not be guilty of the felony murder special circumstance unless the jury also found a specific intent to kill. In either case, [the defendant] would be ineligible for relief under section [1172.6]." (*People v. Harden* (2022) 81 Cal.App.5th 45, 55, fn. 8 (*Harden*).) Here, the prosecution conceded

9

order to carry out or advance [its] commission . . . or to . . . escape therefrom or to avoid detection."

"Accordingly, reading all the charges, the instructions, the verdicts, and the findings as a whole, we see no legal route [Bettancourt's] jury could have taken to convict him without finding he was [Ulsh's] actual killer." (*People v. Beaudreaux* (2024) 100 Cal.App.5th 1227, 1247 (*Beaudreaux*).) We therefore conclude the trial court properly denied his petition at the prima facie stage. (*People v. Delgadillo* (2022) 14 Cal.5th 216, 233 ["we determine . . . that [the defendant] is not entitled to any relief under section 1172.6. Indeed, the record . . . makes clear that [the defendant] was the actual killer and the only participant in the killing"]; see *People v. Curiel* (2023) 15 Cal.5th 433, 463 (*Curiel*) [prima facie showing is not made where record conclusively establishes every element of the offense].)

None of Bettancourt's arguments alters our conclusion. First, Bettancourt contends the trial court erred by relying in part on the summary of facts in our opinion in *Bettancourt I* to deny his petition. But as set forth, *ante*, the record of conviction demonstrates—"with no factfinding, weighing of evidence, or credibility determinations" (*Harden*, *supra*, 81 Cal.App.5th at p. 47)—Bettancourt's ineligibility for section 1172.6 relief. Thus, to the extent the court erred in relying on our prior opinion (an issue we need not and do not decide), any such error was harmless. (See *Beaudreaux*, *supra*, 100 Cal.App.5th at p. 1232.)

Second, Bettancourt argues that a factual question remains as to whether he qualifies as the actual killer because the record does not conclusively establish that the jury found he personally

---

at trial that Bettancourt did not act with the intent to kill, and neither party contends on appeal that the jury found that Bettancourt acted with such intent.

killed Ulsh.  For purposes of section 189, subdivision (e)(1), "actual killer" means "someone who personally killed the victim and is not necessarily the same as a person who 'caused' the victim's death." (*Lopez, supra*, 78 Cal.App.5th at p. 4.)  Personally inflicting harm and proximately causing harm " 'are two different things.' " (*Id.* at p. 17.)  "The Legislature was aware of that difference when it chose to use the term actual killer in enacting Senate Bill No. 1437 to add section 189[, subdivision] (e)." (*Lopez, supra*, at p. 18.)  Bettancourt urges the jury did not necessarily determine he "personally killed" Ulsh because "it is possible the jury found [him] guilty of murder without even finding that his punch to [Ulsh] was what killed him."

In support of this argument, Bettancourt points to the following statements the prosecutor made—outside the jury's presence—while arguing against instructing the jury on second degree murder:

"[The prosecutor]:  . . . [T]here's been no evidence to establish that the punch was the cause of . . . Ulsh's death.

"Literally, it could have been an accident.  He could have—after being punched, he could have stumbled down the road, and there is some evidence to suggest . . . to indicate that quite possibly . . . Ulsh was able to make his way some distance before actually collapsing.

"And so because of that, there is not, a sufficient—there is no evidence to say that it was the punch that actually killed . . . Ulsh.

"And we even have the coroner who testified.  I believe he was actually asked by [defense counsel] about, in and of itself, would that punch have been fatal, and the coroner said, 'No, I wouldn't expect it to be fatal.'

"And that is why, when I was thinking about how to pull the instructions on this case, if you were to ask me could you charge

11

second-degree murder based on implied malice in this case, the answer would be no, I really couldn't, because a punch is not an inherently dangerous act likely to cause great bodily injury or death."

Bettancourt also directs us to three cases where courts concluded that the defendant's record of conviction failed to establish conclusively that he personally killed the victim in question. (See *Lopez, supra*, 78 Cal.App.5th at p. 20 [reversing prima facie stage denial of section 1172.6 petition where the defendant's trial testimony suggested his friend committed the alleged robbery and murder and the court's instructions permitted the jury to conclude that the defendant " 'was involved in the robbery that resulted in the death, but . . . may not have been the actual killer' "]; *People v. Garcia* (2020) 46 Cal.App.5th 123, 154 (*Garcia*) [concluding, in direct appeal, that a person who "hand[s] the murder weapon to the person who actually kills the victim . . . does not qualify as . . . an actual killer under section 190.2[, subdivision] (b)"]; *People v. Vang* (2022) 82 Cal.App.5th 64, 64 [on direct appeal, finding insufficient evidence that the defendant personally killed the victim during a kidnapping where the victim jumped from the defendant's car to her death].)

Bettancourt's argument, however, ignores the jury's determinations that he "actually killed" Ulsh "while . . . engaged in . . . [the] robbery . . . [¶] . . . in order to carry out or advance [its] commission . . . or to facilitate [Bettancourt's] escape." These findings foreclose Bettancourt's contention that the jury might have concluded Ulsh died as a result of some accident unrelated to Bettancourt's attack. The prosecutor's statements outside the presence of the jury cannot and do not subvert the jury's factual findings, which Bettancourt may not relitigate in a section 1172.6 proceeding. (See *Curiel, supra*, 15 Cal.5th at p. 470 ["factual

12

findings should be given preclusive effect. The point . . . is to identify what those factual findings are and how they relate to the elements of murder under a valid theory"]; *People v. Farfan* (2021) 71 Cal.App.5th 942, 947 ["[t]he purpose of section [1172.6] is to give defendants the benefit of amended sections 188 and 189 with respect to issues not previously determined, not to provide a do-over on factual disputes that have already been resolved"].) In addition, we do not view the prosecutor's statements as inconsistent with the jury's determination that Bettancourt's attack, viewed in its entirety, killed Ulsh. (See, e.g., *People v. Bodely* (2023) 95 Cal.App.5th 1193, 1204–1205 [defendant ineligible for section 1172.6 relief as the "actual killer," where he struck victim with a car, knocking the victim onto the car's hood, the victim fell and struck his head on the pavement, and the victim then died from the resulting head injury].)

Indent: *Lopez*, *Garcia*, and *Vang* are distinguishable. *Lopez* and *Garcia* each involved evidence of other perpetrators that would have allowed the jury to convict the defendant without concluding that he personally killed the victim. (*Lopez*, *supra*, 78 Cal.App.5th at pp. 19–20; *Garcia*, *supra*, 46 Cal.App.5th at p. 154.) And in *Vang*—a direct appeal, rather than a section 1172.6 proceeding— "the evidence [did] not permit any inference that [the] defendant was the direct cause of [the victim's] death." (*Vang*, *supra*, 82 Cal.App.5th at p. 91.) Bettancourt, in contrast, did not dispute at trial that he alone attacked Ulsh or that his attack resulted in Ulsh's death.

Indent: Third, and finally, because we conclude the trial court did not err in denying the petition, we necessarily reject Bettancourt's claim that the denial violated his right to due process under state and federal law. (*People v. Garrison* (2021) 73 Cal.App.5th 735, 738.)

13

Accordingly, we affirm.

## DISPOSITION

The order denying Bettancourt's section 1172.6 petition is affirmed.

<u>NOT TO BE PUBLISHED</u>.


                                        ROTHSCHILD, P. J.

We concur:



BENDIX, J.



KELLEY, J.*

---

\* Judge of the San Luis Obispo Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.